# In the United States Court of Federal Claims
**OFFICE OF SPECIAL MASTERS**
Filed: February 12, 2024

* * * * * * * * * * * * * * * * * * * * * * * * *

| | | |
|---|---|---|
| RONALD STURDEVANT, | * | **PUBLISHED** |
| | * | |
| Petitioner, | * | No. 17-172V |
| | * | |
| v. | * | Special Master Nora Beth Dorsey |
| | * | |
| SECRETARY OF HEALTH | * | Decision Awarding Damages; Influenza |
| AND HUMAN SERVICES, | * | ("Flu") Vaccine; Bell's Palsy; Pain and |
| | * | Suffering; Unreimbursable Expenses. |
| Respondent. | * | |
| | * | |

* * * * * * * * * * * * * * * * * * * * * * * * *

William Cochran, Black McLaren Jones Ryland & Griffee, PC, Memphis TN, for Petitioner.
Zoe Wade, U.S. Department of Justice, Washington, DC, for Respondent.

### DAMAGES DECISION[1]

On February 6, 2017, Ronald Sturdevant ("Petitioner") filed a petition for compensation under the National Vaccine Injury Compensation Program ("Vaccine Act" or "the Program"), 42 U.S.C. § 300aa-10 et seq. (2018).[2] Petitioner alleges that he suffered Bell's palsy as the result of an influenza ("flu") vaccination administered on November 3, 2015. Petition at Preamble (ECF No. 1). On July 19, 2022, the undersigned issued a ruling on entitlement, finding that Petitioner was entitled to compensation. Ruling on Entitlement dated July 19, 2022 (ECF No. 89).

---

[1] Because this Decision contains a reasoned explanation for the action in this case, the undersigned is required to post it on the United States Court of Federal Claims' website and/or at https://www.govinfo.gov/app/collection/uscourts/national/cofc in accordance with the E-Government Act of 2002. 44 U.S.C. § 3501 note (2018) (Federal Management and Promotion of Electronic Government Services). **This means the Decision will be available to anyone with access to the Internet.** In accordance with Vaccine Rule 18(b), Petitioner has 14 days to identify and move to redact medical or other information, the disclosure of which would constitute an unwarranted invasion of privacy. If, upon review, the undersigned agrees that the identified material fits within this definition, the undersigned will redact such material from public access.

[2] The National Vaccine Injury Compensation Program is set forth in Part 2 of the National Childhood Vaccine Injury Act of 1986, Pub. L. No. 99-660, 100 Stat. 3755, codified as amended, 42 U.S.C. §§ 300aa-10 to -34 (2018). All citations in this Decision to individual sections of the Vaccine Act are to 42 U.S.C. § 300aa.

The parties were unable to resolve damages and requested that the Court enter a schedule for damages briefs. Since then, the parties' briefs have been filed.

After consideration of all of the evidence, and for the reasons described below, the undersigned finds that Petitioner is entitled to $100,000.00 for actual pain and suffering and $158.53 for past unreimbursed expenses, for a total of $100,158.53.[3]

## I.   PROCEDURAL HISTORY

Petitioner filed his petition on February 6, 2017. Petition. The early procedural history from February 2017 through July 2022 was set forth in the undersigned's Ruling on Entitlement and will not be repeated here. See Ruling on Entitlement at 4-5.

Thereafter, the parties engaged in settlement discussions but were not able to resolve this matter informally. Joint Status Report ("Rept."), filed May 3, 2023 (ECF No. 111). During settlement discussions, Petitioner filed various records, including billing records, updated medical records, photographs, and affidavits. Petitioner's Exhibits ("Pet. Exs.") 58-69. The parties agreed to submit the damages items that remained in dispute to the Court for resolution on the briefs. Joint Status Rept. at 1.

On June 2, 2023, Petitioner filed a brief in support of his claim for damages. Pet. Brief in Support of Damages ("Pet. Br."), filed June 2, 2023 (ECF No. 115). Respondent filed his responsive brief on July 24, 2023. Respondent's Response to Pet. Br. ("Resp. Br."), filed July 24, 2023 (ECF No. 118). Petitioner filed a reply on August 1, 2023. Pet. Reply to Resp. Br. ("Pet. Reply Br."), filed Aug. 1, 2023 (ECF No. 119).

This matter is now ripe for adjudication.

## II.   FACTUAL HISTORY

### A.   Medical Record History

The Ruling on Entitlement issued on July 19, 2022, and it set forth a summary of Petitioner's medical records, affidavits, and hearing testimony. See Ruling on Entitlement at 5-29. Further, the parties have set forth summaries of relevant facts which support their respective positions in their briefs, which the undersigned has reviewed as well as all of the medical records and evidence filed in this matter.

A brief summary of some facts relevant to this Decision follows. While all the records are important, these entries provide specific information about Petitioner's condition important to the undersigned's Decision.

---

[3] Petitioner does not seek lost wages and indicated there is no Medicaid lien. Pet. Brief in Support of Damages ("Pet. Br."), filed June 2, 2023, at 10 (ECF No. 115).

On November 3, 2015, at fifty-one years old, Petitioner received a flu vaccine in his left arm. Pet. Ex. 2 at 2; Pet. Ex. 40 at 1-2.

Two days later, on November 5, 2015, Petitioner presented to his primary care physician, Dr. Christopher R. Depner for right-sided facial numbness that "started yesterday afternoon." Pet. Ex. 3 at 18. Dr. Depner's physical examination revealed paresis of Petitioner's right seventh cranial nerve. Id. at 19-20. Assessment was Bell's palsy. Id. at 20. Dr. Depner commented, "[p]atient with fairly classic Bell's palsy with paresis in the distribution of the right [seventh] nerve and also involving the forehead to some degree. He's unable to close his left[4] eyelid fully."[5] Id. Dr. Depner planned to patch Petitioner's eye, start Petitioner on prednisone[6] and Famvir,[7] and have him follow up in one week. Id.

Petitioner followed up with Dr. Depner on November 10, 2015. Pet. Ex. 3 at 21. Petitioner continued to have paresis of his right seventh cranial nerve. Id. at 23. At a follow up examination on November 23, 2015, Petitioner reported he was doing well but had some eye tearing and fuzzy distance vision. Id. at 24. Dr. Depner's physical examination revealed paresis of right seventh nerve, paralyzed right facial muscles, unable to raise right eyebrow, and weakness closing right eyelid. Id. at 25-26. Assessment remained Bell's palsy. Id. at 26. Dr. Depner found Petitioner had not "made much improvement with his facial paralysis," and ordered him to attend physical therapy. Id.

Petitioner had his initial physical therapy evaluation on December 9, 2015 with Shanna Winters. Pet. Ex. 4 at 44. "[Petitioner] report[ed] that pain lasted for a month but has resolved." Id. He reported "trouble with hand eye coordination, blurry vision, drinking from a cup or straw," and "increased light sensitivity secondary to not being able to close his eye." Id. Ms. Winters' physical examination revealed Petitioner had a drooped eyebrow. Id. at 45. Petitioner was unable to show his teeth, close his eyes, blink, squint, or inflate cheeks. Id. He was able to drink from a straw with difficulty and was unable to drink from a cup. Id.

---

[4] It appears Dr. Depner inadvertently referred to Petitioner's left eyelid, instead of his right.

[5] Dr. Depner added Petitioner was "able to close his right eye adequately, so [it was] no longer drying out and bothering him. He still ha[d] rather dense right facial nerve paresis." Pet. Ex. 3 at 20. It is not clear whether this is from a follow up visit, and if so, which visit.

[6] Prednisone is "a synthetic glucocorticoid derived from cortisone, administered orally as an antiinflammatory and immunosuppressant in a wide variety of disorders." Prednisone, Dorland's Med. Dictionary Online, https://www.dorlandsonline.com/dorland/definition?id=40742 (last visited Jan. 10, 2024).

[7] Famvir, or famciclovir, is "used in the treatment of herpes zoster and . . . of mucocutaneous herpes simplex in immunocompromised patients." Famciclovir, Dorland's Med. Dictionary Online, https://www.dorlandsonline.com/dorland/definition?id=18166 (last visited Jan. 10, 2024).

3

On December 14, 2015, Petitioner returned to Dr. Depner for follow up. Pet. Ex. 3 at 27. Physical examination was unchanged. Id. at 28-29. Assessment remained Bell's palsy. Id. at 31. Dr. Depner wrote "[Petitioner] still ha[d] a rather dense paralysis in the right face . . . . He [was] able to close his eye to within about 90% of full closure." Id.

Petitioner returned to Dr. Depner next on May 25, 2016. Pet. Ex. 3 at 32. Petitioner's Bell's palsy had not resolved completely. Id. Dr. Depner noted Petitioner "still ha[d] right facial weakness, but it ha[d] improved. He [was] able to blink and he [was] able to drink liquids and drink with a straw." Id. at 34. Petitioner reported he was six months out of physical therapy. Id. Dr. Depner found Petitioner was "near the point of maximum medical improvement." Id. Assessment remained Bell's palsy. Id.

On July 4, 2016, Petitioner presented to the Jones Memorial Hospital Emergency Department for a laceration on the left side of his face from an air tool. Pet. Ex. 4 at 5. Petitioner's past medical history included Bell's palsy. Id. at 12. On examination, no mention of facial muscle weakness was noted. Id. at 13.

In 2017, Petitioner presented to Dr. Depner on numerous occasions for unrelated issues. Pet. Ex. 26 at 1-20. In each of the physical examinations from January to April 2017, Petitioner's cranial nerves were grossly intact. Id. at 2, 6, 12, 15. On July 11, 2017, Dr. Depner's physical examination revealed right facial paralysis. Id. at 19. Dr. Depner noted "[Petitioner's] Bell's palsy ha[d] improved quite slowly, but [was] still quite marked. He [was] able to blink. He [could] close his right eye, but not tightly. His cornea [was] not drying out." Id. Dr. Depner told Petitioner he likely would not improve further. Id.

Petitioner visited Dr. Depner various times from 2018 to 2020 for annual examinations or unrelated issues. Pet. Ex. 49 at 3-49. No complaints or comments regarding his Bell's palsy were documented at these visits. See id.

On September 26, 2022, Petitioner established care with Dr. Steven V. Pinto. Pet. Ex. 67 at 15. Dr. Pinto wrote Petitioner requested a letter "that states that his Bell's palsy was due to his flu vaccine. There is no definitive certainty on this but it remains a possibility. . . . The purpose of the letter is for . . . seeking maximum monetary benefit in a lawsuit that he is currently involved in." Id. Assessment listed diagnoses which included "Bell's palsy, possibly from [flu] vaccine in 2012/2013." Id. at 18.

Dr. Pinto authored a letter, dated September 26, 2022, which stated that "[b]ased on compilation of his medical history, there is a clear timeline between [Petitioner] receiving a[] [flu] vaccine in 2012/2013 and subsequently and soon after, developing right-sided Bell's palsy with subsequent right-sided temporomandibular joint disorder and right-sided ear dysfunction, which have caused him significant distress." Pet. Ex. 67 at 19.

On October 24, 2022, Petitioner sought care related to his right ear. Pet. Ex. 66 at 15. At this visited, history of present illness documented Petitioner's facial "paralysis [was] partially improved." Id. Physical examination documented "facial paralysis affection the right side of the

face." Id. at 16. Petitioner's issues with his right ear were not related back to his Bell's palsy by his physician.

Petitioner saw neurologist Dr. Maria Vivino on February 24, 2023. Pet. Ex. 68 at 16. Dr. Vivino summarized Petitioner's clinical course. Id. at 17. She noted that over the years, Petitioner's "right peripheral facial weakness did not change," his "right eye would intermittently tear," and his "[c]onstant numbness over right preauricular region eventually lessened [but] had since not changed." Id. Around six months prior to this visit, Petitioner "[b]egan experiencing recurrent episodes of muscle spasms and 8-10/10 over right ramus of the mandible, with pain radiating to the angle of the mandible on the right. Symptoms would initially be mild/low grade and then grad[ually] increase in severity." Id. This would occur once per month, would be triggered by moving jaw, and would be alleviated within one minute when he would "stop talking and stop moving jaw[]." Id. Petitioner was "concerned these his [new] symptoms [were] related to his right peripheral facial weakness." Id. Petitioner also reported vision problems. Id.

Physical examination revealed "SI tenderness on palpation of the right ramus of the mandible below the right ear" with "[n]o assoc[iated] muscle spasms over right ramus of the mandible." Pet. Ex. 68 at 19. Physical examination of the seventh cranial nerve showed symmetric forehead and lips at rest and palpebral fissure[8] of right eye smaller than the left eye. Id. at 20. "With muscle activation, asymmetry of forehead could not be definitively appreciated." Id. Sclera not seen with passive closure of eyes, and right eye lashes were not buried with active closure of eyes. Id. He was "able to [] open right eye but not to the point of sclera being seen." Id. Decreased contraction of the dilator muscles of the lips on right side seen with baring of teeth. Id. With active closure of mouth, right side of lips could be pulled back, but teeth were not seen. Id.

Impression was "[l]ikely right Bell's palsy" and "[i]ntermittent muscle spasms and pain over right ramus of mandible, with pain radiating to the angle of the mandible on the right" with unknown etiology. Pet. Ex. 68 at 23. Dr. Vivino wrote,

> Although [patient] reported concurrent development of constant numbness over the right preauricular region, which has since improved but has not resolved, latter sensory deficit was not appreciated on neurol[ogic] exam[ination]. Although [patient] reported not being able to see well in the inferolateral aspect of the [visual field] of his right eye since he developed the above peripheral facial weakness, latter [visual field] defect was not confirmed on [visual field] testing with careful confrontation techniques using CF.[9]

Id. With regard to Petitioner's muscle spasms, Dr. Vivino opined they were unrelated to his Bell's palsy. Id.

---

[8] Palpebral fissure is the "the longitudinal opening between the eyelids." Rima Palpebrarum, Dorland's Med. Dictionary Online, https://www.dorlandsonline.com/dorland/definition?id=104268 (last visited Feb. 8, 2024).

[9] It is not clear what "CF" means but it may be an abbreviation for "count fingers."

5

On March 13, 2023, Petitioner underwent a DOT physical examination that demonstrated 20/30 uncorrected vision in his right eye. Pet. Ex. 62 at 7. This was changed from his August 2019 examination that revealed 10/20 uncorrected vision in his right eye. Id. at 3. His horizonal field of vision was 170 degrees in 2019 and 85 degrees in 2023. Id. at 3, 7. Petitioner did not file other DOT physical examination documents.

**B.     Affidavits**

**1.     Petitioner**

Petitioner averred that prior to his flu vaccination on November 3, 2015, he had never suffered from Bell's palsy. Pet. Ex. 1 at ¶¶ 3-4. The day after vaccination, "[he] began to have pain, weakness[,] and paralysis in the right side of [his] face. Id. at ¶ 5; Pet. Ex. 64 at ¶ 8. He "was unable to close his right eye," his "eyesight became blurry," and he "was unable to drink from a cup." Pet. Ex. 1 at ¶ 5; Pet. Ex. 64 at ¶ 8.

He sought treatment and was given steroid medication and an eyepatch. Pet. Ex. 1 at ¶ 6; Pet. Ex. 64 at ¶ 8. He also underwent physical therapy and was given at-home exercises. Pet. Ex. 1 at ¶ 6; Pet. Ex. 64 at ¶ 8.

Prior to vaccination and his Bell's palsy, Petitioner "enjoyed working with [his] hands. [He] built [his] house . . . and enjoyed repairing and maintaining the house, appliances, equipment, automobiles, and motorcycles." Pet. Ex. 64 at ¶ 3. Petitioner averred he is "not able to enjoy working with [his] hands like [he] did before Bell's palsy." Id. at ¶ 9. He explained that "[w]hen [he] [is] working with small items like screws or bolts[,] [his] eye waters, which is annoying and takes away the joy that [he] experienced." Id.

As of the date of his first affidavit, January 30, 2017, Petitioner "continue[d] to have right-sided numbness and loss of sensation, particularly around the right side of [his] mouth." Pet. Ex. 1 at ¶ 7; see also Pet. Ex. 64 at ¶ 8. Additionally, "[his] right eye water[ed] more . . . , [he] continue[d] to blink abnormally, and [was] unable to raise [his] right eyebrow." Pet. Ex. 1 at ¶ 7; see also Pet. Ex. 64 at ¶ 8.

As of May 31, 2023, the date on which he executed his declaration, he explained that he "continue[s] to suffer from Bell's palsy." Pet. Ex. 64 at ¶ 10.

> [He] still ha[s] right-sided numbness and loss of sensation, particularly around the right side of [his] mouth. [He] continue[s] to do facial exercises multiple times per day. If [he] do[es] not, then the right side of [his] face gets tense with pain like the feeling of a leg cramp with pain of three to five on scale of one to ten (ten being the worst). For these reasons[,] [he] constantly do[es] facial exercises. Once every six weeks or so, [he] forget[s] to do [his] exercises and [his] face tenses. A hot shower or heating pad will help reduce the tension. [His] right eye still waters more than normal. Light conditions such as sunny days, fluorescent lights, and light from a TV screen or cell phone screen at night cause [his] right eye to water, which results in [him] constantly wiping [his] eye. In these same

6

> light conditions, [he] blink[s] at a faster pace or may keep [his] eye shut longer than normal. [He] [is] still unable to raise [his] right eyebrow. [He] work[s] as a truck driver and must pass a DOT physical test to continue [his] employment. The fear of not being able to pass the DOT physical and losing [his] source of income causes [him] great distress. The exam includes vision, hearing, and motion tests. At [his] last exam, the room had fluorescent lighting and [his] eye became very tearful while performing the visual test. This was very upsetting for [him]. Fortunately, [he] passed . . . , but [his] condition is permanent and [he] [is] very worried about losing [his] job because of [his] condition.

Id.

Petitioner did not address or provide evidence to support his mileage claims regarding the two disputed trips discussed in more detail below. See infra Part III.B; Pet. Ex. 64; Pet. Reply Br. at 4; Resp. Br. at 11-13.

### 2. Patricia Blevin

Patricia Blevin has known Petitioner for over 20 years and has lived with him since 2002. Pet. Ex. 65 at ¶ 2. On the day Petitioner developed Bell's palsy, she thought Petitioner "had a stroke and it was very upsetting." Id. at ¶ 3.

Prior to his Bell's palsy, Petitioner "enjoyed working with his hands as a do-it-yourself mechanic. He built the house that [they] live in and enjoyed repairing and maintaining the house, appliances, equipment, and [] vehicles." Pet. Ex. 65 at ¶ 4. However, due to his Bell's palsy, Petitioner "has trouble working with smaller mechanical items" because his eye waters, "tak[ing] [] the joy that he used to experience working with his hands." Id. at ¶ 6. She also noted that when Petitioner returns home from working as a trucker, "his Bell's palsy is very noticeable, more so now than it was when it started. His eye waters and he always appears to be itching his face." Id. at ¶ 5. Ms. Belvin added that Petitioner "worries about the future consequences of his Bell's palsy and this is very distressing to him." Id.

## III. PARTIES' CONTENTIONS

### A. Pain and Suffering

#### 1. Petitioner's Contentions

Petitioner requests a pain and suffering award of $175,000.00. Pet. Br. at 9; Pet. Reply Br. at 4. Petitioner notes that he is not aware of any reasoned damages decision in a Bell's palsy case. Pet. Br. at 7. Thus, he cites to a review of civil jury verdicts from 1985 to 2000 for facial nerve paralysis, where the mean award was $567,944.00. Id. (citing Pet. Ex. 69).[10]

---

[10] Daniel D. Lydiatt, Medical Malpractice and Facial Nerve Paralysis, 129 Archives Otolaryngology Head & Neck Surgery 50 (2003).

For support, Petitioner notes awareness of the injury is not in dispute. Pet. Br. at 7; Pet. Reply Br. at 2. At all relevant times, Petitioner "was a competent adult with no impairments that would impact his awareness of his injury." Pet. Br. at 7.

Regarding the duration of Petitioner's injury, Petitioner contends his injury is permanent. Pet. Br. at 7-8; Pet. Reply Br. at 2. Petitioner developed Bell's palsy on November 4, 2015, over eight years ago, and it has persisted since. Pet. Br. at 7; Pet. Reply. Br. at 2. Petitioner's life expectancy is 24 years, and thus, "the potential duration of his injury is approximately [32] years." Pet. Reply. Br. at 2. Petitioner notes Respondent agrees Petitioner's injury is permanent. Id. (citing Resp Br. at 6).

To further support his contention that his injury is permanent, Petitioner cites to statements from his treating physicians and expert. Pet. Br. at 7. Petitioner's expert, Dr. M. Eric Gershwin opined Petitioner's Bell's palsy is permanent. Id. (citing Pet. Ex. 6 at 3). Petitioner's primary care physician Dr. Depner found Petitioner was "near the point of maximum medical improvement" during a visit on May 25, 2016. Id. (quoting Pet. Ex. 3 at 34). Over one year later, on July 11, 2017, Dr. Depner noted Petitioner's Bell's palsy "ha[d] improved quite slowly but [was] still quite marked. . . . He [could] close his right eye, but not tightly." Id. (quoting Pet. Ex. 26 at 19). Dr. Depner indicated Petitioner was not likely to improve further. Id. at 7-8 (citing Pet. Ex. 26 at 19). And at a recent visit on February 24, 2023, physical examination demonstrated ongoing right peripheral facial weakness likely right Bell's palsy. Id. at 8 (citing Pet. Ex. 68 at 20, 23).

Lastly, for severity of Petitioner's injury, Petitioner contends his pain, suffering, distress, and disfigurement are significant. Pet. Br. at 8. He filed photographs, pre- and post-vaccination, showing the effects of his Bell's palsy. Id. (citing Pet. Exs. 41-46, 60-61). Petitioner notes his treatment consisted of an eye patch, Prednisone, Famvir, physical therapy, and home exercise/massage. Id. Petitioner continues to have right-sided numbness and loss of sensation around his right side of his mouth, he does daily facial exercises to prevent tension and pain in his face, and certain lighting conditions cause his eye to water. Id. (citing Pet. Ex. 64). He is fearful of not passing the DOT physical test, which is required for his employment. Id. (citing Pet. Ex. 64). Additionally, Petitioner contends he is no longer able "to enjoy working with his hands." Id. at 9. Prior to developing Bell's palsy, "he built his house and enjoyed repairing and maintaining the house, appliances, equipment, and vehicles." Id. However, his eye now waters when working with small items like screws and bolts, "which is annoying and takes away the joy that he experienced." Id. (citing Pet. Exs. 64-65).

In response to Respondent's arguments regarding the severity of Petitioner's injury, Petitioner first argues he continues to have psychological symptoms, not psychiatric symptoms, following the development of Bell's palsy. Pet. Reply Br. at 2. Second, Petitioner notes his medical records document pain and numbness from his Bell's palsy, despite Respondent's contentions. Id. at 3 (citing Pet. Ex. 3 at 18; Pet. Ex. 4 at 44; Pet. Ex. 68 at 17).

Third, although Dr. Depner described Petitioner's facial expression as "pleasant," Petitioner argues "[l]ittle weight should be given to these notations" because (1) "Dr. Depner noted a pleasant facial expression at every visit, including [Petitioner's] initial presentation for

8

Bell's palsy on November 5, 2015," and (2) medical professionals have explained the difficulties those with facial paralysis face in how they are perceived by others. Pet. Reply Br. at 2-3; see also Pet. Br. at 8 (describing the tremendous "psychological burden of facial paralysis" (quoting Pet. Ex. 8 at 3)).[11]

Lastly, Petitioner notes it "may be true" that evidence was not submitted to support a finding that Petitioner's ability to maintain employment has been impacted by his Bell's palsy, however, Petitioner argues "it does not negate the distress [Petitioner] experiences for fear of losing his job due to his Bell's palsy." Pet. Reply. Br. at 3. "In fact, [R]espondent acknowledges that it is reasonable for [Petitioner] to experience fear of losing his job due to his Bell's palsy." Id. (citing Resp. Br. at 7-8). And Petitioner's diminished vision on DOT examinations "likely contributes to that fear." Id. (citing Pet. Ex. 62 at 3, 7).

Therefore, Petitioner requests $175,000.00 for his past and future pain, suffering, distress, and disfigurement given his level of treatment, permanent nature of his injury, and the duration of his injury for his life expectancy. Pet. Br. at 9; Pet. Reply Br. at 4.

### 2.  Respondent's Contentions

Respondent argues that based on the facts of this case, Petitioner should be awarded $75,000.00 for pain and suffering. Resp. Br. at 6.

First, Respondent contends "there are no complaints of impaired relationships, social distress, or depression[] noted in any of his medical records during the nearly eight years that have passed since the onset of his condition." Resp. Br. at 7. Nor has Petitioner been diagnosed or treated for a psychological consequence of his injury. Id. Respondent notes Petitioner repeatedly denied psychological symptoms. Id. (citing, e.g., Pet. Ex. 3 at 18, 21, 24, 27, 32; Pet. Ex. 26 at 1, 5, 10, 14, 17; Pet. Ex. 49 at 3, 7, 16, 22). "[P]etitioner was noted to be calm and cooperative with a normal mood and affect." Id. Additionally, Dr. Depner repeatedly described Petitioner "as having a 'pleasant' facial expression, and his photographs depict the same." Id. Thus, Respondent concludes that "while some patients with facial paralysis may experience significant psychological distress, there is no evidence in the record to suggest that [P]etitioner did so." Id.

Respondent argues that the only psychological distress described by Petitioner concerns his alleged fear of losing his job. Resp. Br. at 7. Respondent notes that Petitioner continued to pass his DOT tests and "there is no evidence that would suggest that [P]etitioner's facial paralysis impairs his ability to drive a truck in any meaningful way." Id. Respondent contends "[P]etitioner's untreated sleep apnea [] causes him to fall asleep behind the wheel, [and] that poses a significant risk to [P]etitioner's continued employment and likely resulted in his suspension from work in 2018." Id. at 7-8. "Thus, while [P]etitioner's fear may be reasonable," Respondent stressed there is no evidence in the record to "support the claim that [P]etitioner's

---

[11] Reginald F. Baugh et al., Clinical Practice Guideline: Bell's Palsy Executive Summary, 149 Otolaryngology & Neck Surgery 656 (2013).

9

ability to maintain employment as a truck driver has been, or likely will be, impacted by his Bell's palsy." Id. at 8.

Next, Respondent argues that there is no evidence to support Petitioner's complaints of right-sided facial pain and numbness since vaccination as well as diminished eyesight in his right eye between 2019 and 2023. Resp. Br. at 8. For support, Respondent cites to a neurology appointment with Dr. Vivino on February 24, 2023, where "Petitioner reported that he began experiencing painful muscle spasms on the right side of his face six months prior, placing the onset of his facial pain around late-August 2022, or nearly six years post-vaccination." Id. (citing Pet. Ex. 68 at 17). Dr. Vivino also opined these muscle spasms were unrelated to Petitioner's facial paralysis. Id. (citing Pet. Ex. 68 at 23). Thus, given the onset of Petitioner's facial pain in 2022, nearly six years post-vaccination, and the opinion of Petitioner's treating neurologist, Respondent maintained Petitioner's facial pain is unrelated to his vaccine injury. Id. at 8-9.

With regard to Petitioner's complaints of facial numbness, Respondent cites to Dr. Vivino's finding of intact facial sensation[12] on February 24, 2023. Resp. Br. at 8 (citing Pet. Ex. 68 at 20,23). Respondent argues Petitioner's complaint of facial numbness is subjective, contradicted by objective test results, and not supported by any evidence. Id.

Similarly, Respondent finds no evidence to support Petitioner's claim that the decline in his vision from 2019 to 2023 is due to his Bell's palsy. Resp. Br. at 9. No medical provider or expert has opined that they are causally related. Id. And thus, there is no basis to conclude that Petitioner's declining eyesight is related to his vaccination or Bell's palsy. Id.

Lastly, Respondent finds Petitioner's reliance on a review of jury verdicts to be "speculative at best," as the review reported only mean and median award, did not to explain what kind of damages were included in these awards, and did not provide information about the severity of the injuries involved. Resp. Br. at 9.

Overall, Respondent maintains a pain and suffering award of $75,000.00 is fair and adequate given mild nature of Petitioner's pain and suffering, Petitioner's awareness of injury, and the permanent nature of his injury. Resp. Br. at 10. "[Petitioner's] alleged disfigurement is . . . exceedingly mild." Id. Petitioner's treatment was minimal and consisted of prescribed medications and at-home exercises. Id. (citing Pet. Ex. 3 at 20, 26). He was not hospitalized. Id. He did not undergo invasive treatments or procedures. Id. Although Petitioner's facial paralysis remains, he was able to return to work without restrictions within one week of onset. Id. (citing Pet. Ex. 3 at 26, 31). Within six months, he was able to blink, drink, and use a straw. Id. (citing Pet. Ex. 3 at 34). Dr. Vivino, in February 2023, found Petitioner's forehead and lips appeared symmetric at rest and even with muscle activation asymmetry of the forehead could not be appreciated. Id. (citing Pet. Ex. 68 at 20). Dr. Vivino also noted Petitioner was able to close

---

[12] This finding of intact facial sensation related to the neurological examination of Petitioner's fifth cranial nerve. Pet. Ex. 68 at 20. Petitioner's seventh cranial nerve was affected. See Pet. Ex. 3 at 19-20.

his eyes but not bury his lashes on the right side, Petitioner's sensation was intact, and Petitioner's field of vision was full bilaterally. Id. (citing Pet. Ex. 68 at 20).

### B. Unreimbursable Expenses

Petitioner requests $169.96[13] in unreimbursable expenses, consisting of prescription medications ($10.26), doctor's office visits ($100.00), and mileage ($59.70). Pet. Br. at 14-16; Pet. Reply Br. at 4. Only the amount for mileage is in dispute. See Resp. Br. at 11 ("Respondent agrees that [P]etitioner's claims for $10.26 for prescription medications[] and $100.00 for doctor's visits[] are supported by documentation."). For mileage, Petitioner requests $59.70 and Respondent agrees to only $16.31. Pet. Br. at 11-16; Resp. Br. at 11-19. There are two main disputes that explain the monetary difference for mileage.

The first dispute concerns mileage requests on November 5, 2015 and December 14, 2015. Pet. Reply Br. at 4; Resp. Br. at 11-13. Petitioner requests two round trip visits on November 5, 2015 (from his home to his primary care physician and from his home to his pharmacy) and two round trip visits on December 14, 2015 (from his home to his primary care physician and from his home to Jones Memorial Hospital for blood work), which Respondent disputes. Pet. Br. at 14-15; Pet. Reply Br. at 4; Resp. Br. at 11-13. Respondent notes the visits on the same day were to locations close in proximity (0.7 miles and 0.3 miles) to one another. Resp. Br. at 11-13. Respondent argues Petitioner went to these appointments back-to-back before driving home and did not drive home between the visits. See id. at 11-13, 17-19. Petitioner contends Respondent's argument is "without merit" because "[i]t is reasonable to infer that [Petitioner] had to make separate trips for these visits." Pet. Reply Br. at 4. Petitioner did not address these mileage disputes in his affidavit, nor did he provide any other evidence to show that he drove home between his visits on the same day. See id.; Pet. Ex. 64.

The second mileage-related dispute concerns the appropriate rate for calculating mileage; Petitioner contends the appropriate rate for calculating mileage is the IRS business rate, while Respondent argues the appropriate rate to apply is the IRS medical rate. Pet. Br. at 11; Resp. Br. at 13. According to Petitioner, the IRS business mileage rate for 2015 is 0.575, 2016 is 0.54, and 2017 is 0.54. Pet. Br. at 11. Both parties cited and discussed cases that applied the IRS business rate to mileage. Pet. Br. at 1; Resp. Br. at 13-16; Pet. Reply Br. at 4-6; see Williams v. Sec'y of Health & Hum. Servs., No. 90-2239V, 1996 WL 608455 (Fed. Cl. Spec. Mstr. Oct. 10, 1996); Gibson v. Sec'y of Health & Hum. Servs., No. 20-0243V, 2022 WL 17820891 (Fed. Cl. Spec. Mstr. Nov. 16, 2022); Ashe-Robinson v. Sec'y of Health & Hum. Servs., No. 94-1096V, 1997 WL 53450 (Fed. Cl. Spec. Mstr. Jan. 23, 1997).

Respondent argues that although special masters have used the IRS business rate since Williams in 1996, those decisions are not precedential or binding on this case. Resp. Br. at 13-14 (citing Hanlon v. Sec'y of Health & Hum. Servs., 40 Fed. Cl. 625, 630 (1998), aff'd, 191 F.3d 1344 (Fed. Cir. 1999)). "Respondent urges the court to diverge from Williams and apply the

---

[13] Petitioner originally requested $264.68 in unreimbursable expenses, but reduced the amount to $169.96 after removing a request for $94.72 for a consultation between Petitioner and his attorney. See Pet. Br. at 10-18; Pet. Reply Br. at 4-6.

medical rate, which is the appropriate rate to reimburse [P]etitioner for his vaccine injury-related travel expenses." Id. at 14.

Respondent asserts "[t]he reasoning articulated in Williams is flawed." Resp. Br. at 14. The IRS business rate includes fixed costs (depreciation, maintenance, repairs, tires, insurance, and registration fees of the vehicle) and operating expenses (gas and oil), while the IRS medical rate includes only operating expenses. Id. at 14-15; Pet. Reply Br. at 5. Respondent finds the medical rate to be more appropriate, contradicting the reasoning in Williams, where the special master analyzed this issue and found the business rate appropriate. Resp. Br. at 15 (citing Williams, 1996 WL 608455, at *1-2). Respondent also reasons that the Vaccine Act provides compensation for "actual" expenses that have "resulted from" the vaccine injury, and fixed costs included in the IRS business rate "do not 'result from' the vaccine injury." Id. at 15-16. Respondent maintains the IRS medical mileage rate "adequately compensates [P]etitioner for the actual expenses that resulted from his injury." Id. at 16. In response, Petitioner, citing Williams, explains that "the medical rate does not adequately measure the actual cost to a petitioner of the injury, because it does not encompass the full cost of driving an automobile (i.e., depreciation, maintenance, repairs, tires, and insurance)." Pet. Reply Br. at 6 (citing Williams, 1996 WL 608455, at *2).

Further, Respondent notes the Vaccine Act provides awards for items that are "reasonably necessary," which Respondent argues was not addressed in Williams. Resp. Br. at 16. "[W]hile the Act specifies that [P]etitioner is entitled to reimbursement for his travel expenses, it does not require that reimbursement must be 'optimized' to the highest available rate, particularly when the underlying medical care for which travel is being reimbursed is subject to a 'reasonable' standard." Id. Petitioner argues that "[t]he fact that the business rate is higher than the medical rate does not make it unreasonable, and the court in Williams provided a well-reasoned analysis as to why the fixed and operating expenses would be reasonable and necessary to include in the actual costs to a petitioner." Pet. Reply Br. at 6 (citing Williams, 1996 WL 608455, at *1-2).

## IV.   LEGAL FRAMEWORK

Compensation awarded pursuant to the Vaccine Act shall include "[f]or actual and projected pain and suffering and emotional distress from the vaccine-related injury, an award not to exceed $250,000." § 15(a)(4). Additionally, Petitioner may recover "actual unreimbursable expenses incurred before the date of judgment," including those that "(i) resulted from the vaccine-related injury for which [P]etitioner seeks compensation, (ii) were incurred by or on behalf of the person who suffered such injury, and (iii) were for diagnosis, medical or other remedial care, rehabilitation . . . related travel expenses, and facilities determined to be reasonably necessary." § 15(a)(1)(B). Petitioner bears the burden of proof with respect to each element of compensation requested. Brewer v. Sec'y of Health & Hum. Servs., No. 93-0092V, 1996 WL 147722, at *22-23 (Fed. Cl. Spec. Mstr. Mar. 18, 1996).

### A.    Pain and Suffering

There is no formula for assigning a monetary value to a person's pain and suffering and emotional distress.  I.D. v. Sec'y of Health & Hum. Servs., No. 04-1593V, 2013 WL 2448125, at *9 (Fed. Cl. Spec. Mstr. May 14, 2013) ("Awards for emotional distress are inherently subjective and cannot be determined by using a mathematical formula."); Stansfield v. Sec'y of Health & Hum. Servs., No. 93-0172V, 1996 WL 300594, at *3 (Fed. Cl. Spec. Mstr. May 22, 1996) ("[T]he assessment of pain and suffering is inherently a subjective evaluation.").  Factors to be considered when determining an award for pain and suffering include: (i) awareness of the injury; (ii) severity of the injury; and (iii) duration of the suffering.  I.D., 2013 WL 2448125, at *9 (quoting McAllister v. Sec'y of Health & Hum. Servs., No. 91-1037V, 1993 WL 777030, at *3 (Fed. Cl. Spec. Mstr. Mar. 26, 1993), vacated & remanded on other grounds, 70 F.3d 1240 (Fed. Cir. 1995)).

The undersigned may look to prior pain and suffering awards to aid in the resolution of the appropriate amount of compensation for pain and suffering in this case.  See, e.g., Doe 34 v. Sec'y of Health & Hum. Servs., 87 Fed. Cl. 758, 768 (2009) (finding that "there is nothing improper in the chief special master's decision to refer to damages for pain and suffering awarded in other cases as an aid in determining the proper amount of damages in this case").  The undersigned may also rely on her experience adjudicating similar claims.  Hodges v. Sec'y of Health & Hum. Servs., 9 F.3d 958, 961 (Fed. Cir. 1993) (noting that Congress contemplated the special masters would use their accumulated expertise in the field of vaccine injuries to judge the merits of individual claims).  Importantly, however, it must also be stressed that pain and suffering is not determined based on a continuum.  See Graves v. Sec'y of Health & Hum. Servs., 109 Fed. Cl. 579 (2013).

In Graves, Judge Merow rejected the special master's approach of awarding compensation for pain and suffering based on a spectrum from $0.00 to the statutory $250,000.00 cap.  Judge Merow noted that this constituted "the forcing of all suffering awards into a global comparative scale in which the individual petitioner's suffering is compared to the most extreme cases and reduced accordingly."  Graves, 109 Fed. Cl. at 589-90.  Instead, Judge Merow assessed pain and suffering by looking to the record evidence, prior pain and suffering awards within the Vaccine Program, and a survey of similar injury claims outside of the Vaccine Program.  Id. at 595.

### B.    Unreimbursable Expenses: Mileage

Under the Vaccine Act, petitioners are awarded compensation for "actual unreimbursable expenses" that "resulted from the vaccine-related injury," "were incurred by or on behalf of the [injured] person," and "were for diagnosis, medical or other remedial care, rehabilitation, . . . related travel expenses, and facilities determined to be reasonably necessary."  § 15(a)(1)(B).  Petitioners are reimbursed for their mileage if they "provide[] sufficient documentation that [Petitioner] personally incurred the travel expenses in [their] own vehicle and in relation to the vaccine injury."  See Gibson, 2022 WL 17820891, at *13 n.27.

13

Petitioners must provide preponderant evidence to substantiate "related travel expenses" incurred as a result of related medical care. § 15; Brewer, 1996 WL 147722, at *22-23. Petitioners can meet this burden of proof by itemizing the dates and distances of their medical visits through sworn testimony and evidence. Williams, 1996 WL 608455, at *1. However, mileage costs are not compensated where ownership of the vehicle, distance travelled, or primary purpose of the travel are questionable or unclear. See Ashe-Robinson, 1997 WL 53450, at *2 (denying mileage costs to a petitioner when she did not drive her own car or drove for medical issues "not causally related" to her vaccine-related injury); Morgan v. Sec'y of Health & Hum. Servs., No. 20-1286V, 2022 WL 4717958, at *8 (Fed. Cl. Spec. Mstr. Sept. 2, 2022) (denying mileage costs to an undergraduate student when it was unclear if his trips had a secondary purpose of returning to school).

Special masters have found the IRS business mileage rate as appropriate for calculating travel expenses. See, e.g., Williams, 1996 WL 608455, at *2. The business rate "is intended to cover all costs of driving a car," including fixed costs "meant to offset the costs of depreciation, maintenance, repairs, tires, insurance, and registration fees."[14] Id. at *2 (emphasis omitted) (citing I.R.C. § 162). In contrast, the IRS medical rate only covers the variable costs of gas and oil. Id. (citing I.R.C. § 213). The Vaccine Act awards compensation for "related travel expenses . . . determined to be reasonably necessary." § 15(a)(1)(B). The special master in Williams explained that "[t]he most straightforward interpretation of the language of the statute [] is that any 'unreimbursable' expense, which would not have been incurred 'but for' the vaccine-related injury, qualifies under [the Vaccine Act]." Williams, 1996 WL 608455, at *1 (emphasis omitted). When petitioners travel for their vaccine-related injury, they incur both variable costs, like gas, and fixed costs, including higher insurance rates for the miles driven and deterioration of the vehicle. Id. at *1-2. Other special masters have repeatedly concurred with this analysis and used the business rate to reimburse a petitioner for mileage. See, e.g., Ashe-Robinson, 1997 WL 54350, at *2; Gibson, 2022 WL 17820891, at *12; Kleinschmidt v. Sec'y of Health & Hum. Servs., No. 20-0680V, 2023 WL 9119039, at *7 (Fed. Cl. Spec. Mstr. Dec. 5, 2023).

## V. ANALYSIS

### A. Petitioner's Award for Actual Pain and Suffering

In determining an award in this case, the undersigned does not rely on a single decision or case. Rather, the undersigned has reviewed the particular facts and circumstances in this case, giving due consideration to the circumstances and damages in other cases cited by the parties and other relevant cases, as well as her knowledge and experience adjudicating similar cases. The undersigned has reviewed the entire record, including medical records, declarations, expert reports, and all other evidence that has been filed, and finds an award of $100,000.00 in actual pain and suffering is fair, reasonable, and appropriate here.

---

[14] The special master in Williams also found that registration costs constitute a "very, very minimal part of the 'fixed costs' formula." Williams, 1996 WL 608455, at *2 n.2. Such de minimis costs do not impact the reimbursement analysis.

It is appropriate to consider the severity of the injury, awareness of the injury, and duration of the suffering when determining an award for pain and suffering and emotional distress.  In the undersigned's experience, awareness of suffering is not typically a disputed issue in cases involving Bell's palsy.  In this case, neither party has raised, nor is the undersigned aware of, any issue concerning Petitioner's awareness of suffering.  Pet. Br. at 7; Resp. Br. at 10.  Thus, based on the circumstances of this case, the undersigned determines Petitioner's awareness of the injury is not in dispute and he has full awareness of his suffering.

The factors that particularly influence this Ruling are as follows.  Regarding duration, the injury occurred in November 2015 and Petitioner has been experiencing residual effects since.  Thus, Petitioner has experienced the effects of his vaccine-related injury for over 8 years.

Regarding severity, three sets of facts influence the undersigned's analysis: the initial course of the injury, the most recent examination reflecting the residual effects of the injury, and the Petitioner's affidavit describing how the injury has affected him.

First, Petitioner's initial examination showed that Petitioner had a right seventh nerve paresis.  In follow up visits over the next few weeks, Petitioner was unable to raise his eyebrow and had weakness and difficulty in closing the eyelid.  He also had tearing and blurriness of his affected eye.  Next, a physical therapy evaluation in December 2015 noted Petitioner's drooped brow, his inability to close his eye completely, and his inability to drink from a cup.  After six months, a physical therapist documented that Petitioner's level of function was back to 90%.  However, the physical therapist rated Petitioner's facial disability as a 45 out of 100 and under the Facial Grading System he received a composite score of 13 out of 100.[15]  Pet. Ex. 4 at 45.  Petitioner required eye protection at work and had difficulty with hand-eye coordination and drinking liquids.  Petitioner also continued to struggle with blurred vision, light sensitivity, and an inability to completely close his eyelid.  Moving forward to July 2017, almost two years later, a physician's note stated that Petitioner's Bell's palsy was "still quite marked."  Pet. Ex. 26 at 19.

Second, a more recent neurology examination in February 2023 revealed that Petitioner's right peripheral facial weakness continued.  The neurologist documented Petitioner was unable to fully open and close his right eye, the palpebral of the right eye was smaller than the left eye and "decreased contraction of the dilator muscles of the lips on the right side."  Pet. Ex. 68 at 20.  While Petitioner reported that he had decreased inferolateral vision, this "[visual field] defect was not confirmed on [visual field] testing with careful confrontation techniques using CF."  Id. at 23.

---

[15] The Facial Grading System ("FGS") is a "standardized measure of facial impairment."  Jennifer S. Brach & Jessie M. VanSwearingen, Physical Therapy for Facial Paralysis: A Tailored Treatment Approach, 79 Physical Therapy & Rehabilitation J. 397 (1999), https://academic.oup.com/ptj/article/79/4/397/2857760.  FGS uses an "observer-based rating scale" that evaluates resting posture, voluntary movement, and synkinesis.  Id.  These respective ratings are combined to form an FGS score that ranges from 0 (complete paralysis) to 100 (normal facial function).  Id.

Third, the undersigned considers Petitioner's affidavit explaining the effects of his injury. Before his injury, Petitioner "enjoyed working with [his] hands. [He] built [his] house . . . and enjoyed repairing and maintaining the house, appliances, equipment, automobiles, and motorcycles." Pet. Ex. 64 at ¶ 3. Petitioner averred that he is "not able to enjoy working with [his] hands like [he] did before Bell's palsy." Id. at ¶ 9. He explained that "[w]hen [he] [is] working with small items like screws or bolts[,] [his] eye waters, which is annoying and takes away the joy that [he] experienced." Id. Petitioner continues to experience numbness and loss of sensation on the right side of his face. Id. at ¶ 10. Petitioner must do facial exercises multiple times per day to prevent moderate pain from recurring. Id. He remains unable to raise his right eyebrow. Id. Petitioner must pass a DOT physical test to maintain his employment. Id. He fears that his permanent injury could lead him to fail the test, which includes a vision assessment. Id. While Petitioner has recently passed the test, the risk of a future test failure and "losing his source of income causes [him] great stress." Id.

The jury verdict information provided by Petitioner is inadequate to form any basis for comparison for several reasons. The largest category of cases cited by Petitioner are negligence cases against medical providers for alleged failure to provide either informed consent or surgical misadventures that resulted in bad outcomes. See Pet. Br. at 7; Pet. Ex. 69 at 3. In such negligence cases, fault is at issue. For example, a surgeon could be found negligent for failing to properly inform a patient of the risks of nerve injury and failing to adhere to the standard of care in performing the procedure. The facts in evidence to show a violation in the standard of care, in order to find a surgeon liable for negligence, reflect poorly on the defendant. Such negative evidence can raise the value of damages in a jury verdict. However, negligence is not at issue under the Vaccine Act. No such facts regarding negligence exist or bear any relevance to this case.

Further, most of the cases cited involved otologic and cosmetic surgery. These cases do not explain the types of injuries to the seventh cranial nerve. Moreover, since these were mostly surgical cases, the injuries presumably resulted from cutting the nerve, transecting the nerve completely, or some other physical injury to it. This physical mechanism of injury differs from the type of injury in this case, which the undersigned found an innate immune system and inflammatory response to the vaccination. See Ruling on Entitlement at 37. Regardless, there are no facts about the types of injuries sustained in the jury verdict publications to allow any meaningful comparison with the facts in the present case.

The undersigned has considered the numbers proposed by both parties; however, she does not agree that the amount suggested by either party is appropriate. Considering the record as a whole, the undersigned finds that $100,000.00 represents a fair, reasonable, and appropriate amount of compensation for Petitioner's pain and suffering. The undersigned recognizes that Petitioner continues to suffer from Bell's palsy after more than eight years. The award of $100,000.00 acknowledges Petitioner's long duration of suffering, his worry about job security, and his facial disability.

### B. Award for Past Unreimbursed Expenses

The parties agree Petitioner should be reimbursed for prescription medications ($10.26) and doctor's office visits ($100.00). Pet. Br. at 14-16; Resp. Br. at 11. However, they dispute the appropriate cost for mileage, with Petitioner requesting $59.70 and Respondent agreeing to only $16.31. Pet. Br. at 11-16; Resp. Br. at 11-19.

The first dispute concerns whether Petitioner made separate round-trip visits to two locations in close proximity to each other on two dates. First, on November 5, 2015, Petitioner argues in his brief that he drove round trip from his home to his primary care physician, and then later drove round trip from his home to the pharmacy. However, as Respondent contends, the primary care physician's office and the pharmacy are separated by 0.7 miles. Resp. Br. at 11-12. Petitioner also maintains that on December 14, 2015, he drove round trip from his home to his primary care physician, and then later drove round trip from his home to Jones Memorial Hospital. Again, Respondent noted the physician's office and the hospital are separated by 0.3 miles. Id. at 12-13. Respondent maintains that Petitioner went to these appointments back-to-back and did not drive home between the visits. Petitioner contends that Respondent's argument is "without merit" because "[i]t is reasonable to infer that [Petitioner] had to make separate trips for these visits." Pet. Reply Br. at 4.

Given the close proximity of the locations, the undersigned finds the Respondent's arguments more persuasive. It is more reasonable to infer that Petitioner attended the visits consecutively before returning home and did not return home between the visits on both dates. Mileage is compensated when a petitioner has "provided sufficient documentation that [petitioner] personally incurred the travel expenses in [his] own vehicle and in relation to the vaccine injury." See Gibson, 2022 WL 17820891, at *13 n.27. Here, Petitioner did not submit any evidence to show that he made separate trips for these visits. Without evidence, the undersigned cannot conclude that it would be appropriate to award the mileage on these days as Petitioner requests. See Morgan, 2022 WL 4717958, at *8 (denying mileage costs to an undergraduate student when it was unclear if his trips had a secondary purpose of returning to school); Ashe-Robinson, 1997 WL 54350, at *3 (denying mileage costs to a petitioner when she did not drive her own car or drove for medical issues "not causally related" to her vaccine-related injury). This results in a reduction of 19.8 miles in 2015. See Resp. Br. at 11-13.

Regarding the dispute over the appropriate IRS mileage rate to use, the undersigned finds Petitioner's arguments more persuasive. Respondent has failed to provide any persuasive reasoning to diverge from the settled practice of using the IRS business rate. Using the business rate covers all the costs of driving a car that Petitioner would not have incurred but-for his vaccine-related injury. See Williams, 1996 WL 608455, at *2; Kleinschmidt, 2023 WL 9119039, at *7. Such compensation does not constitute an elective preference for an "optimized" rate. See Resp. Br. at 16. Rather, the compensation accurately reimburses Petitioner for the total and "reasonably necessary" costs of his care related to his vaccine injury. § 15.

17

For the reasons discussed above, the undersigned awards Petitioner for $48.27 mileage based on the business mileage rates of 0.575 for 2015[16] and 0.54 for 2016.[17] The total amount of unreimbursable expenses awarded is $158.53.[18]

## VI.   CONCLUSION

In determining an award in this case, the undersigned does not rely on a single decision or case. Rather, the undersigned has reviewed the particular facts and circumstances in this case, giving due consideration to the circumstances and damages in other cases cited by the parties and other relevant cases, as well as her knowledge and experience adjudicating similar cases.

In light of the above analysis, and in consideration of the record as a whole, the undersigned finds that Petitioner should be awarded (1) $100,000.00 for pain and suffering and (2) $158.53 for past unreimbursed expenses, for a total of $100,158.53.

**IT IS SO ORDERED.**

**s/Nora Beth Dorsey**
Nora Beth Dorsey
Special Master

---

[16] 93.8 miles – 19.8 miles = 74 miles.  74 miles x 0.575 = $42.55.

[17] 10.6 miles x 0.54 = $5.72.

[18] $42.55 + $5.72 + $10.26 + $100.00 = $158.53.